# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 17, 2026

Lyle W. Cayce
Clerk

No. 24-50982

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

SAINT JOVITE YOUNGBLOOD,

*Defendant—Appellant.*

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:23-CR-135-1

_____

Before DUNCAN, OLDHAM, and WILSON, *Circuit Judges.*

PER CURIAM:[*]

To fund a centi-million-dollar gambling habit, Saint Jovite Youngblood hoodwinked numerous people out of their savings. A federal jury convicted him of wire fraud and money laundering. The district court sentenced Youngblood to 480 months in prison. Youngblood appealed. We AFFIRM.

_____

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 24-50982

I

Youngblood's scheme spanned several decades, multiple States, and over two dozen victims. We offer only a brief sketch of it here. Presenting himself as a "Delta Force" veteran and former federal agent, Youngblood would get close to a victim through casual social events. Youngblood would offer business advice and access to lucrative investment opportunities—claiming unique access to gold, antiques, and other valuable items as a result of his "history" as a "federal agent" in the Middle East.

After building the victims' trust, Youngblood would scare them. Youngblood would claim that contacts with the Mafia, Mexican Cartels, or federal law enforcement had warned him that a close friend or relative of the victim was in grave danger. Once the victim believed his or her loved one was about to be kidnapped or murdered, Youngblood would offer to protect them. Inevitably, this protection required Youngblood to send large amounts of cash to his associates, ranging from $10,000 to nearly $100,000. Youngblood's victims would understandably move heaven and earth to get Youngblood the money—drawing on business accounts or lines of credit, and in some cases selling their homes, to afford Youngblood's "protection." Youngblood insisted on being paid by check, and he instructed victims to conceal the payments as innocuous business transactions. Most believed that Youngblood would return the money—a belief Youngblood encouraged by offering "collateral" for the victims to hold. Offered items included $44,000 in cash wrapped in a golf club sleeve, an antique clock, a vintage Confederate battle flag, and a baseball bat used by Lou Gehrig.

Of course, nothing Youngblood said was true. Youngblood never served in Delta Force, he was never a federal agent, and he had no relevant contact with the Government or any other nefarious organization. In reality, Youngblood was a prolific gambler who squandered over $140 million on Las

Vegas slot machines between 1998 and 2023. In some years, Youngblood bet as much as $21.5 million. As to the exotic valuables Youngblood offered as collateral, those were phony too: The Confederate flag was worth $125,000, not $2,000,000, and the Lou Gehrig baseball bat was an old softball bat.

Youngblood's lies eventually caught up with him. One victim, Eric Perardi, gave Youngblood as much as $800,000 over a seven-month period between 2022 and 2023 on the pretense that Youngblood was protecting Perardi's relatives from hitmen hired by a Mexican drug cartel. Perardi eventually asked for his money back, and when Youngblood offered to return just $14,000, Perardi grew suspicious. An appraisal of the Confederate battle flag Youngblood offered him as collateral revealed its true value, and Perardi contacted the FBI. Following a sting operation, Youngblood was arrested and charged with four counts of wire fraud under 18 U.S.C. § 1343 and an additional count of money laundering under 18 U.S.C. § 1957. A jury convicted Youngblood on all counts. Youngblood timely appealed.

## II

Youngblood raises three issues on appeal. First, (A) Youngblood claims the Government introduced insufficient evidence that one of the wires related to Perardi was part of his fraud scheme. Second, (B) Youngblood claims the district court erred in rejecting a requested jury instruction. And third, (C) Youngblood argues his 480-month sentence was substantively unreasonable.

We address each contention in turn.

## A

Evidence first. Our review of evidentiary sufficiency is de novo, but with "substantial deference to the jury verdict." *United States v. Perry*, 35 F.4th 293, 316 (5th Cir. 2022) (quotation omitted). To carry its burden on a count of wire fraud, the Government needed to prove "(1) a scheme to

defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud." *United States v. Spalding*, 894 F.3d 173, 181 (5th Cir. 2018) (quotation omitted). Youngblood challenges the second element: He contends the Government failed to show that a $36,000 wire was "in furtherance of the scheme" to get an $83,000 check from Perardi. *Ibid.*

Some explanation of the timeline is helpful. Youngblood made two requests for protection fees from Perardi in July 2022. First, Youngblood said that Perardi's son was in danger of being kidnapped from his school in Austin. Youngblood demanded $86,000 to pay for protection. Perardi paid it by check, but he stated that any additional funds would require a wire transfer from his personal account with Washington Federal to his business account with Wells Fargo. Later that month, Youngblood again demanded protection money from Perardi. This time Youngblood wanted an $83,000 check. Perardi mailed a check to Youngblood, but Perardi again reiterated that the payment required wiring money to the Wells Fargo business account. On July 27, Youngblood cashed the $83,000 check. Perardi initiated the corresponding $36,000 wire transfer the same day.

Youngblood claims this transfer could not have been "in furtherance" of defrauding Perardi, as Youngblood received the check from Perardi *before* the latter initiated the transfer. Youngblood also points out that Perardi made other transfers from his personal account in July, implying that the $36,000 transfer was unnecessary to keep Perardi solvent and might have been for attorney's fees instead. If Perardi made the transfer after Youngblood's fraud was complete and did not even need to do so, the argument goes, the transfer cannot have been in furtherance of the fraud.

This argument fails. That Perardi's transfer did not precede Youngblood receiving the check, either chronologically or as a matter of

financial necessity, is neither here nor there. The second element merely requires that a transfer be "in furtherance of the scheme." *Spalding*, 894 F.3d at 181 (quotation omitted). A wire may only "somehow contribute[] to the successful continuation of the scheme" and still meet this test. *United States v. Swenson*, 25 F.4th 309, 317 (5th Cir. 2022) (quotation omitted). And a wire that *follows* a fraudulent payment is sufficient, so long as the defendant "act[s] with knowledge that [the wire] will follow in the ordinary course of business, or . . . [the wire] can reasonably be foreseen." *Pereira v. United States*, 347 U.S. 1, 8–9 (1954). Youngblood knew that Perardi's wire transfer would "follow in the ordinary course of business," as Perardi informed him on two separate occasions of the need to move funds between accounts to meet the $83,000 demand. *Ibid.* Thus, a jury could reasonably conclude that Youngblood knew a wire transfer would result from his demand of $83,000 dollars, and that the transfer was "part of the execution of the scheme as conceived by [Youngblood] at the time." *Schmuck v. United States*, 489 U.S. 705, 715 (1989); *see also United States v. Traxler*, 764 F.3d 486, 489–91 (5th Cir. 2014).

What's more, one need not rely on foreknowledge in this case. Even assuming a break in the logical chain between the demand and transfer, Youngblood made more demands of Perardi over the next several months. And Perardi testified that he needed to periodically move money into his business accounts to avoid missing payments or drawing attention to the withdrawals. As such, the jury could reasonably conclude that the $36,000 wire shielded Youngblood's activities from suspicion and was part of Youngblood's "ongoing venture[]" to defraud Perardi. *Traxler*, 764 F.3d at 490 (quotation omitted).

Youngblood's sufficiency argument fails.

No. 24-50982

B

Next, Youngblood challenges the court's refusal of a proposed jury instruction on causation. We review this claim "only for an abuse of discretion," and Youngblood must show "that his requested instructions were (1) correct statements of the law, (2) not substantially covered in the charge as a whole, and (3) of such importance that 'the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense.'" *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) (quoting *United States v. Upton*, 91 F.3d 677, 683 (5th Cir. 1996)).

In the district court, Youngblood proposed a lengthy causation instruction. His proposed instructions included three paragraphs of quotations from prior cases, with six footnotes. On the whole, the instructions emphasized that the Government needed to show a causal link between a wire transfer and the fraud scheme, and "that a wire transmission [that] merely occurred during [the] scheme to defraud" was not unlawful.

The district court rejected Youngblood's lengthy instructions. The court instead included one paragraph on causation. The court's instruction stated it "must be proved beyond a reasonable doubt . . . that the use of the interstate or foreign wire communications facilities was closely related to the scheme" and that the wire had to be made "in an attempt to execute or carry out the scheme."

We reject Youngblood's challenge to the jury instructions. The court's instructions "substantially covered" Youngblood's proposed instructions. *Davis*, 132 F.3d at 1094. Both communicated that a wire needed to be "part of" executing the fraud, *Schmuck*, 489 U.S. at 715—whether denoted as "execut[ing] or carry[ing] out the scheme" (as the Government put it) or being "in furtherance of the scheme to defraud" (as Youngblood put it).

6

Youngblood now claims that, because of the omission of his instructions, "[t]he jury did not know that the wire must have been in furtherance of the scheme or necessary to its completion." But that's belied by the plain text of the court's instructions, which stated that the wire must be "closely related to the scheme" and "an attempt to execute or carry out the scheme." We see no meaningful difference between these two standards, let alone a difference justifying reversal for an abuse of discretion.

Moreover, any error did not "seriously impair" Youngblood's ability to present his causation defense. On cross-examination of Perardi, Youngblood's attorney pointed out that the $36,000 transfer was sent after Youngblood had cashed the $83,000 check. In the same exchange, the attorney pointed out large payments from Perardi's Wells Fargo account in July—implying that the $36,000 wire was actually for Perardi's attorneys' fees, not Youngblood's demand. And finally, Youngblood's attorney denied that Youngblood "caused wires to be transmitted . . . for the purpose of executing his scheme" in his closing argument, and again harped on the timing of the July 2022 transfer. As such, the jury heard several times that Youngblood denied causing Perardi to send the July 2022 wire. Because Youngblood presented his theory on causation multiple times, the failure to highlight the point in the jury instructions did not "seriously impair" Youngblood's defense on this point.

C

Finally, the sentence. Youngblood challenges the substantive reasonableness of his 480-month prison term. He claims the sentence is more than double the top of the Guidelines range and that the district court failed to identify a compelling reason for the departure.

We cannot agree. A non-Guidelines sentence will be upheld where the court provides "fact specific" reasons and "include, for example,

aggravating or mitigating circumstances relating to personal characteristics of the defendant, his offense conduct, his criminal history, relevant conduct or other facts specific to the case at hand." *United States v. Mares*, 402 F.3d 511, 519 (5th Cir. 2005), *abrogated on other grounds by United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024). Such a sentence may only be overturned on a showing that it "(1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors." *United States v. Smith*, 440 F.3d 704, 708 (5th Cir. 2006).

Youngblood cannot meet this standard. During his two-hour sentencing hearing, Youngblood spent nearly an hour alleging a conspiracy against him by federal agents and prison officials, denying responsibility for any of his crimes, and attacking the character of several of his victims. Several of the victims submitted impact statements, describing in detail how Youngblood had robbed them of life savings, homes, and a peaceful retirement. An FBI agent also testified, focusing on both the harm to victims and Youngblood's pathological lying during their investigation. During the court's imposition of the sentence, Youngblood interrupted several times. During one of these exchanges, the court expressed its hope that "there's some part of [Youngblood] that [was] reached by the expressions of pain of the people [he] victimized," and Youngblood interrupted to say "There isn't." Youngblood then removed himself from the courtroom voluntarily. The court then discussed the 18 U.S.C. § 3553(a) sentencing factors in detail. It highlighted the testimony from Youngblood's victims as evidence of the seriousness of the offense, Youngblood's complete lack of repentance, and the risk that Youngblood would go on to continue defrauding people if released from jail. The court also emphasized Youngblood's "pathological" lying, a habit Youngblood displayed that very morning in appearing to accuse federal law enforcement of trying to have him killed while in custody.

No. 24-50982

Reviewing that record, we cannot say that the court erred in rendering an above-Guidelines sentence. Youngblood's cruelty to vulnerable people, refusal to take responsibility, need to cause pain to his victims, and likelihood of future re-offending were all "fact specific" reasons supporting the district court's § 3553(a) analysis. *Mares*, 402 F.3d at 519. As such, Youngblood failed to show that the district court abused its discretion in sentencing him to a 480-month prison term. Because the sentence was not an abuse of discretion, we need not address the Government's contention that plain error review applies to Youngblood's sentencing challenge.

AFFIRMED.